**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ANTHONY LESANE, et al.**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**DONALD C. WINTER, Secretary of the Navy,**<br><br>**Defendant.** | **Civil Action No. 09-0891 (JDB)** |

## MEMORANDUM OPINION

Plaintiff Anthony Lesane and 19 other Navy police officers bring this collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., alleging that they are entitled to compensation for the time it takes them to don and doff their uniforms, protective gear, and firearms.[1] Currently before the Court is [32] Defendant Secretary of the Navy's ("Navy") motion for summary judgment. For the reasons set forth below, the Court will deny the Navy's motion.

## BACKGROUND

Plaintiffs are police officers with the Office of Naval Intelligence ("ONI") who patrol the Naval Maritime Intelligence Center ("NMIC") in Suitland, Maryland. Three shifts of police officers patrol NMIC around the clock. The day shift runs from 6:00 a.m. to 2:30 p.m.; the

[1] Plaintiffs have withdrawn Count Two of their complaint, which claimed that the Navy failed to pay them locality salary adjustments in violation of the FLSA. Pl.'s Mem. of Law in Opp. to Def.'s Summ. J. ("Pl.'s Opp.") [Docket Entry 33] at 1 n.1; Am. Compl. [Docket Entry 11] ¶¶ 30-35.

"swing shift" runs from 2:00 p.m. to 10:30 p.m.; and the night shift runs from 10:00 p.m. to 6:30 a.m. Def.'s Sealed Mem. in Supp. of Mot. for Summ. J. ("Def.'s MSJ") [Docket 32], Lawton Decl. ("Lawton Decl.") ¶ 3.

By the beginning of a shift, an officer must be wearing a uniform and carrying protective gear. Under ONI Police Standard Operating Procedure No. 33, the uniform consists of appropriate footwear, an undershirt, socks, a turtleneck or long-sleeved shirt and tie, ONI-issued pants, a nameplate, rank insignia, and optional headwear. Def.'s MSJ, Ex. 1. The protective gear includes a flashlight and a "Sam Brown belt," or a duty belt, which contains a radio case, pepper mace, a baton strap, a magazine pouch, handcuffs, a holster, and a first responder's pouch. Id. Officers are also required to wear a ballistics vest. Id.

Officers are given the option of putting on their uniforms and protective gear in a locker room at the Security Operations Center at NMIC, or at home. Id. at 284; Lawton Decl. ¶ 9; Def.'s MSJ, Ex. 2, Pls.' Supp. Ans. to Def.'s First Set of Disc. Requests, Nos. 1-2. If an officer puts on her uniform at home, however, she must cover the uniform insignia until she arrives at NMIC. Def.'s MSJ, Ex. 1. The evidence in the record indicates that most of the officers don their uniforms at home, but put on their protective gear at NMIC. Def.'s MSJ, Ex. 3 (statements from 18 plaintiffs). A few officers don most of the uniform at home, but put on the uniform shirt and protective gear at NMIC. See id. (statements of Officers Hillard, Pittman, L. Boomer). Finally, a few officers choose to don the entire uniform, and all of the protective gear, at NMIC. See id.; Armwood Depo. at 13-14 (statements of Officers Cooper and Armwood). None of the plaintiffs who submitted evidence put on the protective gear at home.

The officers are also required to carry a Navy-issued firearm during their shifts. Lawton

Decl., Exs. 1 & 2. Firearms and ammunition cannot be taken home, so the officers must obtain them at the beginning of each shift from the NMIC armory. Lawton Decl. ¶ 10. Standard Operating Procedure 20 governs the procedure for obtaining weapons. Lawton Decl., Exs. 1 and 2. Under SOP 20, the procedure runs as follows: An "issuing officer" hands the receiving officer three duty magazines; the receiving officer places two of the magazines in the magazine pouch in the utility belt. Lawton Decl. ¶ 11. The issuing officer obtains the assigned weapon for the receiving officer, locks the slide to the rear, verifies that the magazine well and chambers are empty and that the weapon has the action open, and hands the weapon to the receiving officer. Id. The receiving officer inspects the weapon and re-verifies that the action is open and that the magazine well and chamber are empty. Id. After the issuing officer approves, the receiving officer inserts a magazine into the magazine well, releases the slide stop, ensures the safety is on, decocks the handgun, and holsters it. Id. If an officer is on an assignment that requires carrying a shotgun, the officer obtains the shotgun at the same time as the handgun. W. Boomer Depo. at 25-26; Lesane Depo. at 39.

After receiving the assigned weapon or weapons, the officers walk to the roll call room for a briefing, which typically lasts around 15 minutes. Lawton Decl. ¶ 4. The officers then walk to their assigned posts and relieve the officers from the outgoing shift. Id. ¶ 13. All of the posts can be reached in five minutes or less. Id. Thus, the incoming officers will usually relieve the outgoing officers by 20 minutes past the hour. Id. ¶ 14. The outgoing officers then return to the Security Operations Center and turn in their weapons in a process that is essentially the reverse of the arming-up process. Id. ¶ 12. The officers may then take off their protective gear and change back into civilian clothes either at NMIC or at home. Def.'s MSJ, Ex. 3 (officers'

statements describing doffing process).

Plaintiffs are not paid for the time they spend donning their uniforms and protective gear and obtaining their assigned weapons. As explained below, it is not clear whether they are paid for doffing their weapons, gear, and uniforms. On May 13, 2009, plaintiffs filed this collective action under the FLSA, 29 U.S.C. § 201 et seq., claiming that they should be compensated for the time spent on those activities. Compl. [Docket 1].

STANDARD OF REVIEW

"Whether an activity is preliminary or postliminary to principal activities for purposes of § 254(a)(2) of the Portal-to-Portal Act is a mixed question of law and fact because the precise nature of the employee's duties is a question of fact, while application of the FLSA to those duties is a question of law." Baker v. Barnard Constr. Co., Inc., 146 F.3d 1214, 1216 (10th Cir. 1998); see also Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 741 n.19, 743 (1981).

Summary judgment is appropriate when the materials in the record show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. Thus, the non-moving party cannot rely on mere speculation or compilation of inferences to defeat a motion for summary judgment. See Hutchinson v. Cent. Intelligence Agency, 393 F.3d

226, 229 (D.C. Cir. 2005). Nor can the non-moving party rely on conclusory statements with no evidentiary basis to establish a genuine issue of material fact. See Ass'n of Flight Attendants v. Dep't of Transp., 564 F.3d 462, 465 (D.C. Cir. 2009). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249-50 (citations omitted).

DISCUSSION

The FLSA mandates that employees be compensated for hours worked. Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686-87 (1946). The question here is whether the time that officers spend donning and doffing their uniforms, gear, and arms is compensable work.

Whether activities that occur before and after an employee's main tasks are compensable has vexed courts since the 1940s. In 1944, the Supreme Court held in Tennessee Coal, Iron & R.R. Co. v. Muscoda Local No. 123 that miners were entitled to compensation for the time they spent in "compulsory travel" to subterranean mine shafts, noting that the travel occurred "entirely on [the employer's] property and is at all times under [its] strict control and supervision." 321 U.S. 590, 598 (1944). Two years later, the Supreme Court held that employees had to be compensated for the time it took to walk from the plant entrance to their work stations, as well as for the time they spent "pursu[ing] certain preliminary activities" at their work stations, such as putting on aprons and overalls. Anderson, 328 U.S. at 692-93.

Congress reacted to Anderson with the passage of the Portal-to-Portal Act, which significantly limited employer liability for activities before or after the main part of the employee's workday. 29 U.S.C. § 254. The Portal-to-Portal Act provides that employers are not required to compensate employees for

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
>
> (2) activities which are preliminary to or postliminary to said principal activity or activities,
>
> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a) (emphasis added). The Portal-to-Portal Act does not define "principal activity," but the Department of Labor issued regulations addressing that question shortly after the passage of the Act. See 29 C.F.R. § 790.8. The regulations explained that "[t]he legislative history . . . indicates that Congress intended the words 'principal activities' to be construed liberally . . . to include any work of consequence performed for an employer, no matter when the work is performed." Id. § 790.8(a). "[T]he term 'principal activities' includes all activities which are an integral part of a principal activity," including "closely related activities which are indispensable to its performance." Id. § 790.8(b), (c). In an example pertinent here, the regulations explained that

> [I]f an employee in a chemical plant . . . cannot perform his principal activities without putting on certain clothes, changing clothes on the employer's premises at the beginning and end of the workday would be an integral part of the employee's principal activity. On the other hand, if changing clothes is merely a convenience to the employee and not directly related to his principal activities, it would be considered as a 'preliminary' or 'postliminary' activity rather than a principal part of the activity.

Id. § 790.8(c).

The Supreme Court first addressed the meaning of "principal activity" in Steiner v. Mitchell, 350 U.S. 247 (1956). Steiner involved workers in a battery plant who handled highly toxic chemicals. Id. at 248-50. Under state law and the employer's rules, the employees were

required to change clothes and shower at the battery plant at the end of each shift. Id. at 250-51. The Court held that "activities performed before or after regular hours of work" were compensable if they were "an integral and indispensable part of the principal activities for which covered workmen are employed . . . . " Id. at 255-56. Given the dangerousness of the chemicals, the Court found that changing clothes and showering were "clearly" integral and indispensable to the work of the battery plant employees, but noted that its opinion did not apply to changing clothes and showering "under normal conditions." Id. at 249, 256.

The fundamental question before the Court is therefore whether the ONI officers' donning and doffing of clothing, gear, and arms is "integral and indispensable" to their principal activity, protecting NMIC. Since Steiner, several courts have addressed the compensability of donning and doffing clothing and equipment under various conditions, but it is a question of first impression in this Circuit. The compensability of the officers' three tasks -- changing uniforms, donning protective gear, and acquiring a weapon -- will be assessed independently.

A. Uniforms

The Navy argues that changing uniforms is not "integral and indispensable" to the officers' principal activity of guarding NMIC for two reasons. First, the Navy argues that changing clothes is not integral and indispensable unless the employees are required to change clothes on the employer's premises. Second, the Navy argues that uniforms are not integrally related to the core activities the officers perform.

The regulations interpreting the Portal-to-Portal Act provide some support for the Navy's first argument. The regulations state that "if an employee in a chemical plant . . . cannot perform his principal activities without putting on certain clothes, changing clothes on the employer's

premises at the beginning and end of the workday would be an integral part of the employee's principal activity." 29 C.F.R. § 790.8(c) (emphasis added). A footnote to the regulation adds that "[s]uch a situation may exist where the changing of clothes on the employer's premises is required by law, by rules of the employer, or by the nature of the work." 29 C.F.R. § 790.8(c) n.65.

Although the regulation deals with changing clothes on the employer's premises, it does not explicitly say that changing clothes is an integral and indispensable activity only if it must take place on the employer's premises. The Department of Labor has, however, taken that position in a 2006 advisory memorandum. There, the DOL wrote that "[i]t is our longstanding position that if employees have the option and the ability to change into the required gear at home, changing into that gear is not a principal activity, even when it takes place at the plant." Wage & Hour Adv. Mem. No. 2006-2 (May 31, 2006). Such opinion letters "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance," although they are not binding on courts. Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944).

Courts have come to different conclusions as to whether the option of donning and doffing a uniform at home necessarily makes the donning and doffing non-compensable. Relying largely on the Department of Labor's view, a divided panel of the Ninth Circuit recently held that police officers who had the option of changing clothes and gear at home were not entitled to compensation. Bamonte v. City of Mesa, 598 F.3d 1217, 1232-33 (9th Cir. 2010). Several district courts have relied on Bamonte in reaching the same conclusion. See, e.g., Reed v. Cnty. of Orange, 716 F. Supp. 2d 876, 882-83 (C.D.Cal. 2010); Musticchi v. City of Little

Rock, Ark., 734 F. Supp. 2d 621, 626 (E.D. Ark. 2010). Other courts, however, have held that the option to change at home is not determinative. Anderson v. Perdue Farms, Inc., 604 F. Supp. 2d 1339, 1355 (M.D. Ala. 2009) ("[The court] must consider three factors to determine whether an activity is integral and indispensable, and none of those factors involves the location (at the home or at the workplace) of the activity."); see also Rogers v. City & Cnty. of Denver, No. 07-541, 2010 WL 1904516, at *4 (D. Colo. May 11, 2010).

In this case, the Court sees no reason to disagree with the DOL's view that employees who genuinely have the "option and ability" to change clothes at home should not be compensated for the time it takes to do so. In that situation, donning a work uniform is analogous to putting on appropriate clothes for work, which nearly all employees do without compensation every day. The task of donning an ONI-approved uniform -- consisting of ONI-issued pants, an undershirt, turtleneck or long-sleeved shirt and tie, uniform shirt, socks, footwear, a nameplate, insignia, and optional headwear -- is not significantly different or more burdensome than putting on any other work-appropriate outfit, such as a business suit or a McDonald's uniform. It is true that the officers must cover the insignia when they are traveling to work, but the evidence indicates that most officers do put on their uniforms at home, so that requirement does not appear to be a significant deterrent. See Def.'s MSJ, Ex. 3 (statements of officers).

The Court therefore holds that because the ONI officers have the option to change into their uniforms at home, and because most officers indeed do so, donning the uniform is not integral and indispensable to their policing activities. Hence, the Court need not address whether a police officer's uniform is "integral" to completing his assigned tasks in the same way that

items like handcuffs are integral to police work. See Martin v. City of Richmond, 504 F. Supp. 2d 766, 773-74 (N.D. Cal. 2007) (discussing this issue); Lemmon v. City of San Leandro, 538 F. Supp. 2d 1200, 1204-05 (N.D. Cal. 2007) (same).

B. Gear

The officers' gear -- a "duty belt," a radio case, pepper mace, a baton strap, a magazine pouch, handcuffs, a holster, a first-responders pouch, a flashlight, and a ballistics vest -- presents a different question. The Navy concedes that the gear is "integral" to the officers' performance of their duties, since it directly aids them in dealing with suspects, protecting NMIC, and protecting the officers themselves. Def.'s MSJ at 24.

Donning and doffing gear is not covered by the regulations or the 2006 DOL advisory memorandum. The regulations and the DOL memorandum refer to "clothes," and items like pepper mace and flashlights do not fall within the plain meaning of "clothes."[2] Hence, there is no authority for the proposition that donning gear is not compensable if the officer has the option to do so at home. The record evidence and common sense also suggest that donning gear should be compensable despite the officers' option to don at home. Although officers may, in theory, take all of their gear home and put it on there, none of the officers who submitted statements does so. Def.'s MSJ, Ex. 3. The Navy has offered no evidence that any officers don or doff protective gear at home. Given the bulk of the required equipment -- as well as the obvious

---

[2] The DOL has taken conflicting positions on whether protective equipment counts as "clothes." The Department's most recent memorandum states that such equipment is not "clothes" under a plain-meaning definition of the term. Wage & Hour Adv. Mem. No. 2010-2 (June 16, 2010); but see Wage & Hour Adv. Mem. No. 2007-10 (May 14, 2007) ("clothes" includes protective equipment); Wage & Hour Adv. Mem. No. 2002-2 (June 6, 2002) ("clothes" includes protective equipment); Wage & Hour Adv. Mem. dated Dec. 3, 1997 ("clothes" does not include protective equipment).

reasons that officers might prefer to keep items like pepper spray at work -- it is not clear whether officers realistically have the "option and ability" to don their gear at home. Cf. Wage & Hour Adv. Mem. No. 2006-2 (changing clothes is not compensable when workers have the "option and ability" to do so at home) (emphasis added); 29 C.F.R. § 790.8(c) n.65 (changing clothes may be compensable "where the changing of clothes on the employer's premises is required by law, by rules of the employer, or by the nature of the work") (emphasis added). The nature of the gear encourages, if it does not actually necessitate, changing at work. Hewing to a bright-line rule that employers need not compensate employees who have the option to don gear at home would ignore reality, and it would create perverse incentives for employers. See Martin, 504 F. Supp. 2d at 776.

Hence, donning and doffing protective gear is integral and indispensable to the officers' principal activity, protecting NMIC. It is therefore compensable unless the time the officers spend putting on and taking off gear is de minimis.

C. Arms

The Navy does not dispute that weapons are integral and indispensable to the officers' tasks. Def.'s MSJ at 25-29. It also concedes that, by Navy regulation, arming up must be done at NMIC. Id. at 25. Unless the time spent arming up is de minimis, then, it is compensable under the FLSA and the Portal-to-Portal Act.

D. De Minimis Analysis

When the Supreme Court held in Anderson that workers had to be compensated for time spent walking in the employer's factory, the Court added one important caveat:

> We do not, of course, preclude the application of a de minimis rule where the minimum walking time is such as to be negligible. The workweek . . . must be

> computed in light of the realities of the industrial world. When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified by the actualities of working conditions or by the policy of the Fair Labor Standards Act. It is only when an employee is required to give up a substantial measure of his time and effort that compensable working time is involved.

328 U.S. at 692. Under Anderson, the pertinent figure is the "minimum" time necessary to complete the task. Id.; see also id. ("[C]ompensable working time [i]s limited to the minimum time necessarily spent in walking at an ordinary rate along the most direct route from time clock to work bench."). To compensate employees for more than the minimum required time would reward inefficiency. See id.

Several circuits have now agreed that courts applying the de minimis rule should consider three things: (1) the practical difficulty of recording the compensable time, (2) the aggregate amount of time at issue, and (3) the regularity with which the task is performed. Rutti v. Lojack Corp., 596 F.3d 1046, 1056-57 (9th Cir. 2010); DeAsencio v. Tyson Foods, Inc., 500 F.3d 361, 374 (3d Cir. 2007); Gorman v. Consol. Edison Corp., 488 F.3d 586, 594 n.7 (2d Cir. 2007); Brock v. City of Cincinnati, 236 F.3d 793, 804 (6th Cir. 2001); Reich v. Monfort, Inc., 144 F.3d 1329, 1333 (10th Cir. 1998); Bobo v. United States, 136 F.3d 1465, 1468 (Fed. Cir. 1998). Most courts have found that tasks that take less than 10 minutes each working day are de miminis. Lindow v. United States, 738 F.2d 1057, 1062 (9th Cir. 1984) (collecting cases); see also Carter v. Panama Canal Co., 314 F. Supp. 386, 392 (D.D.C. 1970) (15 minutes is de minimis). The Office of Personnel Management, which handles wages of federal civilian employees, has adopted a 10-minute rule by regulation. 5 C.F.R. § 551.412(a)(1). However, a bright-line ten minute rule might not be faithful to the three-part test for determining whether a given activity is de minimis. If an employee spends exactly nine uncompensated minutes every

day on compensable activities, the time is de minimis under the bright-line rule but perhaps compensable under the three-part test.

In this case, several plaintiffs submitted minute-by-minute timelines of their donning and doffing activities. See Def.'s MSJ, Ex. 3. The timelines do not purport to show the minimum time necessary to deal with the gear and weapons, only the amount of time the employees actually spent doing so on a typical shift. Id. According to the timelines, the minimum time needed to gear up was 3 minutes. Id. (Officer Hilliard). The minimum time needed to arm up was 1 minute for a handgun alone, and 3 minutes for a handgun and a shotgun. Id. (Officers King, Blye, and W. Boomer, 1 minute; Officer Conerly, 3 minutes with a shotgun). The minimum time needed to disarm was 1 minute for officers with and without shotguns. Id. (Officers King and L. Boomer, without shotgun; Officer Conerly, with shotgun). The minimum time needed to doff gear was 1 minute. Id. (Officer Lindsay). The aggregate minimum time needed for donning and doffing gear and arms was thus 6 minutes per shift without a shotgun, or 8 minutes per shift with a shotgun.

In addition to those times, however, the Court must also take into account some of the time between activities. This is because the Supreme Court has held that

> any activity that is "integral and indispensable" to a "principal activity" is itself a "principal activity" under § 4(a) of the Portal-to-Portal Act. Moreover, during a continuous workday, any walking time that occurs after the beginning of the employee's first principal activity and before the end of the employee's last principal activity is excluded from the scope of that provision, and as a result is covered by the FLSA.

IBP, Inc. v. Alvarez, 546 U.S. 21, 37 (2005). Translated to the context of this case, Alvarez means that donning and doffing protective gear, which the Court has concluded is "integral and indispensable" to the officers' principal activities, is itself a "principal activity." Under the

"continuous workday" rule, then, officers must be compensated for all of their activities from the time they gear up to the time they take off their gear. Most importantly here, under Alvarez, officers must be compensated for the time they spend waiting in line to arm up at the beginning of the day and waiting in line to disarm at the end of the day.[3] The Department of Labor confirmed this interpretation of Alvarez in an advisory memorandum, explaining that "Alvarez . . . clearly stands for the proposition that where the aggregate time spent donning, walking, waiting and doffing exceeds the de minimis standard, it is compensable." Wage & Hour Adv. Mem. No. 2006-2 (May 31, 2006). Hence, in order to decide whether the amount of uncompensated work the officers perform each day is de minimis, the Court must compute and include the time the officers spend waiting to arm up and disarm.

Such a computation, however, cannot be made on the current record. For activities like gearing up and arming up, the Court was able to review the officers' statements to determine the minimum time necessary to complete the activity. The logic in using the minimum time was that compensating officers for more than the minimum would encourage inefficiency. See Anderson, 328 U.S. at 692. The Court cannot, however, use the same logic to calculate waiting time. How long an employee spends waiting in line at the armory depends on factors out of her control, such as the number of officers already in line and the efficiency of the issuing official. Rather than using the minimum waiting time, then, it seems that the Court should use an average of all

[3] Officers must also be compensated for the time they spend walking from the locker room to the armory, walking from armory to the roll call room, and reversing the procedure at the end of the day, but plaintiffs have conceded that the amount of time spent walking is negligible. Def.'s MSJ, Ex. 2, Nos. 5 & 10. The record also shows that nearly all officers spend time picking up and returning radios after gearing up and before gearing down, but plaintiffs have not claimed that this is a required activity for which they should be compensated.

officers' waiting times. But because most officers did not record their waiting time, or did not separate out time spent waiting to arm and time actually spent arming, the Court cannot calculate that average based on the evidence before it. Hence, it is impossible to say whether the time officers spend "donning, walking, waiting and doffing exceeds the de minimis standard" under the bright-line ten minute rule. See Wage & Hour Adv. Mem. No. 2006-2 (May 31, 2006). The Court notes, however, that a review of the officers' timelines shows that most officers spend well over ten minutes per shift on donning, doffing, and waiting in line, which suggests that the properly compensable time needed to do so is also over ten minutes. See Def.'s MSJ, Ex. 3.

It is similarly impossible to make a determination that the aggregate uncompensated time is de minimis under the three-part test. As previously explained, that test considers the practical difficulty of recording the time, the regularity of the additional work, and the aggregate amount of time. See Rutti, 596 F.3d at 1056-57. The first two factors favor plaintiffs. The practical difficulty of recording the time here is not great: officers could simply clock in when they begin donning gear, and clock out when they finish doffing gear. Given the continuous workday rule, the Navy would not need to compensate officers for discrete chunks of time, which would be much harder to measure. Additionally, the uncompensated work is very regular; it occurs every shift. The final factor also does not help the Navy. As explained, this Court cannot calculate the aggregate amount of time on the current record, although there is reason to believe that it is at least ten minutes per shift.

In one additional argument against this conclusion, the Navy contends that time spent disarming and doffing gear at the end of the day is already compensated. The Navy explains that an officer is paid overtime whenever he is "relieved after his shift has concluded," and that if an

officer can return to the Security Operations Center and turn in his weapon before his shift concludes, he may leave early. Def.'s MSJ at 7-8. Hence, the Navy contends, plaintiffs are already paid for time spent doffing if they must stay beyond the end of their scheduled shift. Id.; id. at 21 n.14. However, it is unclear whether overtime pay is available any time the officer cannot depart NMIC by the end of his shift, or whether overtime is paid only when the officer is relieved from his post late. See Def.'s MSJ at 21. Additionally, the record does not show whether an officer's "shift" ends when he returns to the Security Operations Center, when he disarms, or when he finishes doffing gear and leaves NMIC. Finally, there appears to be an informal policy that overtime is not paid unless the officer has stayed significantly beyond the end of his shift, i.e., for at least fifteen minutes. Armwood Depo. at 32; Gruny Depo. at 36-37; King Depo. at 42. A review of the record evidence shows that most officers are able to disarm and return their weapon by the time their shift ends, but most do not finish doffing their gear until approximately five minutes after their shift ends. Def.'s MSJ, Ex. 3. That is, officers may be paid for part, but are likely not paid for all, of the time it takes to disarm and doff their gear. Hence, because it is not clear that disarming and doffing time is currently compensated in full, the Court cannot grant summary judgment to the Navy on this ground.

Because the Navy has not shown that time spent in integral and indispensable activities is de minimis, the Court must deny its summary judgment motion. This result is in line with the results in other donning and doffing cases. Courts frequently grant summary judgment in cases where it is clear, as a matter of law, that an employee's preliminary or postliminary activities are not integral and indispensable to her principal tasks. See, e.g., Bamonte, 598 F.3d at 1233; Reed, 716 F. Supp. 2d at 883-84; Martin, 504 F. Supp. 2d at 776-77. Deciding whether the aggregate

time spent in compensable activities is de minimis, however, often requires trials, stipulations, or experts. See, e.g., Perez v. Mountaire Farms, Inc., 650 F.3d 350, 370-71 (4th Cir. 2011); De Asencio, 500 F.3d at 364 & n.5; Metzler v. IBP, Inc., 127 F.3d 959, 962 (10th Cir. 1997). Here, as in those cases, more evidence is required to resolve this dispute.

CONCLUSION

For the foregoing reasons, the Court will deny the Navy's motion for summary judgment. A separate Order accompanies this Memorandum Opinion.

/s/
John D. Bates
United States District Judge

Dated: December 30, 2011